NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DARREL REEVES<br><br>Plaintiff,<br><br>v.<br><br>HUDSON CO. JAIL MEDICAL DEPT., DR. HEMSLEY, *Med. Director*, OSCAR AVILES, *Director*, D.R. *and all that's involve in this matter*, CFG HEALTH SYSTEMS, LLC, ESSEX CO. CORR. MEDICAL DIRECTOR, WARDEN/DIR.HENDRICKS, HUDSON CO CORR. MEDICAL DIRECTOR,<br><br>Defendants. | Civ. Action No. 09-2791 (KSH)<br><br><u>OPINION</u> |

**KATHARINE S. HAYDEN, U.S.D.J.**

**I. Introduction**

In this prisoner's rights case, plaintiff Darrel Reeves asserts claims under 42 U.S.C. § 1983 against four defendants: (1) Dr. Michael Hemsley, the Medical Director at Hudson County Correctional Center ("Hudson"); (2) Oscar Aviles, the Warden/Director at Hudson; (3) Lionel Annicette, the Essex County Correction Medical Director; and (4) Roy Hendricks, the Warden/Director of Essex County Correctional Center ("Essex"). Reeves also includes an unnamed doctor at Hudson who allegedly made a joke about his eye without examining him or giving him anything for the swelling and itching. Reeves initially filed two separate actions, one

1

against the Hudson defendants[1] [D.E. 1] and one against the Essex defendants [D.E. 9]. The lawsuits were consolidated on August 19, 2009. [D.E. 8.] The complaints alleged that, because he complained to the Hudson and Essex medical staffs regarding his eye, arm and leg, but failed to receive treatment, he suffered cruel and unusual punishment. On November 20, Hendricks filed an answer and third party complaint naming CFG Health Systems, LLC ("CFG") as a third party defendant. [D.E. 24.] CFG is the contracted medical provider for Essex. (Hendricks Third Party Compl. ¶ 2.) The remaining defendants, as well as CFG, have all moved for summary judgment. [D.E. 93, 97, 99, 100.]

The Court notes that in his opposition brief, Reeves has stated, "Never did Mr. Reeves complain about any arm and leg condition concerning this complaint." (Opp'n Br. at 30.) The Court therefore deems Reeves's claim abandoned as it relates to arm or leg issues; this opinion focuses solely on Reeves's alleged eye injuries.

## II. Statement of Facts

Reeves asserts that his troubles began in a vacant lot in Jersey City. There, between 1 and 2 a.m. on February 24, 2009, Reeves lit a cigarette while fixing an unplugged air conditioner unit, causing the air conditioner to explode in his face. (Reeves Dep. 19:15.) He immediately went home, where his alarmed girlfriend called 911; an ambulance took him to Jersey City Medical Center at approximately 4:30 a.m. (*Id.* 21:8–29:4.) According to hospital records, Reeves was diagnosed with first-degree thermal burns on his face and corneal abrasions in both eyes. (Jersey City Medical Center Records, attached to Annicette/CFG Notice of Motion as Ex. F, at 9.) He was given Vigamox eye drops for the abrasions, Bacitracin ointment for his face, and Percocet for the pain. (*Id.* at 10.) The doctors predicted that the corneal abrasions would

---

[1] Reeves's initial complaint also named Hudson, pleaded incorrectly as Hudson County Jail Medical Department, as a defendant, but it was dismissed on June 17, 2009, because it is not a "person" subject to suit under § 1983. [D.E. 2.]

heal in one to three days and sent Reeves home at 9:30 a.m. (*Id.* at 7, 14.) The records indicate that Reeves was instructed to follow up at the Columbus Health Center or Metropolitan Family Health Network. (*Id.* at 8.) He did not, however, receive follow-up treatment, though he testified that he filled the prescription given to him by the emergency room doctor at a Walgreens pharmacy. (Reeves Dep. 39:22-40:14.) During discovery in this action, Walgreens could find no records for Reeves. (Walgreens Custodian of Records Aff., attached to Annicette/CFG Notice of Motion as Ex. G.)

### A. *Hudson*

Two months after the accident, on April 28, 2009, Reeves was arrested pursuant to a burglary charge[2] and sent to Hudson; there, he had an intake visit with a nurse. (Reeves Dep. 7:10–18; Hemsley Answers to Interrogs., attached to Hemsley Statement of Uncontested Material Facts as Ex. D.) According to Dr. Hemsley's answers to interrogatories, Dr. Zara noted that no skin issues, such as scarring, were present that would indicate a past burn to Reeves's face, nor did Reeves indicate the burns to the nurse. (Hemsley Certif., attached to Hemsley Statement of Uncontested Material Facts as Ex. F; Hudson Medical Records, attached to Hemsley Statement of Uncontested Material Facts as Ex. E.) Reeves was seen again on May 3 by a physician's assistant, Joseph Deraville, who ordered Motrin and Zantac. (Hemsley Answers to Interrogs., attached to Hemsley Statement of Uncontested Material Facts as Ex. D; Hudson Medical Records, attached to Hemsley Statement of Uncontested Material Facts as Exhibit E.) Reeves did not complete a visual acuity test, nor did Deraville record any eye abnormalities or scars. (Hudson Medical Records, attached to Hemsley Statement of Uncontested Material Facts as Exhibit E.) Reeves indicated in a letter of complaint sent to Judge Maurice Gallipoli, that on May 3 he told the doctor about his eye, whereupon the doctor flashed a light in his eye, laughed,

---

[2] Reeves pled guilty to burglary in October 2009, but the events relevant to this case all occurred before then.

said there was nothing wrong, and told Reeves to leave his office. (Letter to Judge Gallipoli, attached to Hudson Compl.) However, Dr. Hemsley states in his answers to interrogatories that on May 3 Reeves did not mention his prior burn or eye injury. (Hemsley Answers to Interrogs., attached to Hemsley Statement of Uncontested Material Facts as Ex. D.)

On May 8, Reeves had an appointment with Dr. Zara at Hudson. He reported that he had been exposed to an electrical fire, which he claimed caused him third- and fourth-degree burns to his face. (*Id*.) He claimed he suffered from headaches and blurring in his left eye and requested an eye exam. (Hudson Medical Records, attached to Hemsley Statement of Uncontested Material Facts as Exhibit E.) Reeves was prescribed Tylenol 500 mg as needed. (*Id*.) According to Reeves, he was called back to medical to address his eye pain and eyesight. (Reeves Compl. at 23.) He claims "nothing was done," though he admits receiving "eye water." (*Id*.) Dr. Hemsley states in his interrogatories that Reeves was referred to an eye clinic on May 8 to address the complaints of blurriness in his left eye. (Hemsley Answers to Interrogs., attached to Hemsley Statement of Uncontested Material Facts as Ex. D.) On May 11, Reeves saw Dr. Zara again. (*Id*.) Dr. Hemsley states in his answers to interrogatories that Dr. Zara recommended expediting Reeves's eye clinic referral to address his blurry vision. (*Id*.)

Reeves attached to his complaint several grievance forms he claims to have filed. One, dated May 16 and addressed to Aviles, stated that he was forced to take medicine that was "harming," that nothing had been done to treat his eyes, and that his eyesight was getting worse. (Grievance Form, May 16, 2009, attached to Hudson Complaint.) In another, sent to a Mr. Howard and dated May 22, Reeves complained about his eyes and stated that he had yet to receive any medical attention. (Request Form, May 22, 2009, attached to Hudson Complaint.) In a third form, sent to Aviles and dated May 27, he indicated that his eyesight was getting

4

worse, that he had sent numerous grievance requests and sick call slips, and that nothing had been done. (Grievance Form, May 27, 2009, attached to Hudson Complaint.) On the same form, Reeves mentioned that Judge Gallipoli had sent a letter to Aviles and Aviles had still not done anything regarding Reeves's eye condition. (*Id*.) Also on May 27, Reeves sent an Inmate Request Form to Aviles asking why he had yet to be treated and stating that he could only see blurry colors and could not lift his arms above his head. (Request Form, May 27, 2009, attached to Hudson Complaint.)

      Reeves had another appointment with Dr. Zara on June 1. (Hemsley Answers to Interrogs., attached to Hemsley Statement of Uncontested Material Facts as Ex. D.) Dr. Hemsley states in his answers to interrogatories that on that day, Reeves complained of a burn in his eye. (*Id*.) Dr. Zara did not indicate any tenderness, discharge, or redness, nor any need for immediate treatment. (*Id*.) On June 8, Reeves met with Dr. Barry Lerner, an optometrist at the Eye Clinic at Hudson. (*Id*.) Dr. Lerner's note mentioned that Reeves said his eye was burned, but that there was no injury to the cornea or sclera. (*Id*.; Hudson Medical Records, attached to Hemsley Statement of Uncontested Material Facts as Ex. E.) Dr. Lerner noted that Reeves had 20/200 vision in one eye and 20/400 vision in the other eye. (Hudson Medical Records, attached to Hemsley Statement of Uncontested Material Facts as Ex. E.) He also stated that Reeves may have been "malingering" and had photophobia, a fear of bright light. (*Id*.) He also recommended that Reeves see an ophthalmologist to examine his visual acuity, but did not recommend an emergency appointment. (*Id*.) Dr. Hemsley never personally examined Reeves during his incarceration at Hudson. (Hemsley Answers to Interrogs., attached to Hemsley Statement of Uncontested Material Facts as Ex. D.)

*B. Essex*

On June 9, Reeves was transferred to Essex after he claimed a guard at Hudson was being abusive by shining a light in his eyes. (Reeves Dep. 58:21–5.) That day, Reeves had an initial intake with nurse Nkechi Orjiungo, but he never mentioned his eye issue and "denie[d]" any eye problems. (Essex Medical Records, attached to Annicette Notice of Motion as Ex. C.) The only medical complaints Reeves reported were of a herniated disc and two artificial discs in his back. (*Id.*) Reeves stated in his deposition that he mentioned his eye problem to the nurse but that she was busy flirting with an officer and ignored him. (Reeves Dep. 62:12–63:9.) On June 17, Reeves met with Advanced Practice Nurse Stephanie Zdanowski. (Essex Medical Records, attached to Annicette Notice of Motion as Ex. C.) She noted that his only physical problems were tooth decay, chronic back pain, laminectomy, and a non-specific reaction to a tuberculosis test. (*Id.*) Zdanowski also noted that Reeves was not able to recall and describe the details of his relevant medical background and was uncooperative and resistant to answering questions. (*Id.*)

On July 17 at around 9 a.m., Dr. Saladin Abdu Nafi received a phone call from Judge Gallipoli. (*Id.*) During their telephone conversation, Judge Gallipoli informed Dr. Abdu Nafi that Reeves had sent him a letter stating that Reeves had submitted sick call slips regarding "going blind" and other non-specific visual disturbances. (*Id.*) Dr. Abdu Nafi noted that a review of the record showed no sick call slips or visual issues from the time of intake until July 17, and he stated that he would speak to the patient. (*Id.*) Later that day Dr. Abdu Nafi met with Reeves, who told the doctor about his burns and claimed that he was seen on February 24, 2009, at Jersey City Medical Center for thirteen to fourteen hours due to an electrical burn. (*Id.*) Reeves claimed his vision was blurry and that he got glasses from Hudson two to three months prior. (*Id.*) Reeves's medical history from Hudson was not given to Essex at the time of intake

and his transfer records were not available. (*Id.*) Dr. Abdu Nafi noted that when Reeves weighed himself he could read the scale. (*Id.*) He also noted that Reeves was "garrulous," very anxious, and feeling around the room as if blind. (*Id.*) The doctor prescribed a hot pack to be used on Reeves's right lower eye lid for three days, Tylenol 325 mg, Hydrochloric acid .05% solution to both eyes two times a day for seven days, and eye wash solution to clean the eyes two times a day for seven days. (*Id.*) Reeves states in his opposition brief that he never received the hot pack for his eyes. (Opp'n Br. at 30.) On July 21, Essex received Reeves's records from Hudson. (Essex Medical Records, attached to Annicette Notice of Motion as Ex. C.) There was no mention of any burns, but Dr. Abdu Nafi made a note to himself that he would check into Jersey City Medical Center's records. (*Id.*)

On July 25, Reeves was seen by nurse practitioner Michael Ojelade for a sick call slip. (*Id.*) Reeves had sties in both eyes and was told to use a warm compress until the problem resolved. Three days later, on July 28, Reeves was seen again by Dr. Abdu Nafi, who referred him to an eye doctor. (*Id.*) On August 10, Reeves went to the Ophthalmology Clinic at East Orange General Hospital, where licensed practical nurse Michelle Eugene and Dr. Duncan examined him. (*Id.*) Dr. Duncan diagnosed Reeves with dry eyes, hyperopia (near sightedness) and presbyopia (far sightedness). (*Id.*) He gave Reeves artificial tears and a prescription for glasses. (*Id.*) Reeves states in his deposition that it took thirty-five days to receive the eye drops and that he did not get the glasses he was prescribed. (Reeves Dep. 75:20–76:13.) On October 13, Reeves filed an inmate sick call request, complaining of left shoulder pain, right rib pain, and bloody urine, and requesting more eye wash for his eye irritation. (Essex Medical Records, attached to Annicette Notice of Motion as Ex. C.) The doctor noted that he would order urine analysis, X-Rays, and an orthopedic examination. (*Id.*) On October 14, Reeves had an

7

orthopedic examination by Dr. O'Connor, whose notes indicated that Reeves had been receiving artificial tear solution at that time. (*Id.*) Reeves was never examined personally by Dr. Annicette. (Annicette Certif. ¶ 3.)

On October 19, Reeves was released from Essex. (Annicette Certif. ¶ 18.) He stated in his deposition that after his release from Essex he used money from a previous settlement with Hudson to see a doctor on Kennedy Boulevard in Jersey City. (Reeves Dep. 136:18.) According to the deposition, he complained about his eyes and the doctor did not prescribe anything, but did recommend "further eye stuff and get some glasses and so forth." (*Id.* 137:13–5.) Reeves did not obtain additional treatment because he said he needed the money to find a place to live. (*Id.* 137:16–9.) He was arrested for burglary on January 14, 2010, and is currently incarcerated at Southern State Correctional Facility. (*Id.* 8:18–24; D.E. 112.)

### III. Summary Judgment Standard

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "affect[s] the outcome of the suit under the governing law." *Id.* The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Id.* Moreover, "[a]lthough entitled to the benefit of all justifiable inferences from the evidence, *Anderson*, 477 U.S. at 255, the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific

facts showing that there is a genuine issue for trial,' [or] else summary judgment, 'if appropriate,' will be entered." *United States v. 717 S. Woodward St.*, 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e)). The district court's role in deciding the merits of a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

### IV. The "Deliberate Indifference" Standard

Just as the Eighth Amendment protects the constitutional rights of convicted prisoners, the Due Process Clause of Fourteenth Amendment protects pretrial detainees. *See Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979). The Supreme Court has determined that detainees' constitutional claims must be analyzed against the background of Eighth Amendment case law, and that the protection provided by the Fourteenth Amendment is "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Thus, "the fourteenth amendment imposes on local governmental actors the same duty to provide medical care for pretrial detainees that the eighth amendment imposes with respect to convicted prisoners." *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1067 (3d Cir. 1991).

In addition to proscribing the "unnecessary and wanton infliction of pain," the Eighth Amendment prohibits punishment that is disproportionate to the crime committed. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (citing *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Accordingly, the government is obligated to "provide medical care for those whom it is punishing by

9

incarceration," and a prison official violates a pretrial detainee's constitutional rights if the detainee has a serious medical condition to which the official is deliberately indifferent. *Id.*

To be sufficiently serious to form the basis of an Eighth Amendment complaint, a prisoner's distress must amount to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Id.* (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The medical need, instead, must be such that without treatment the prisoner would be subject to "undue suffering or the threat of tangible residual injury." *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3rd Cir. 1987) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)). Similarly, where the denial or delay in medical treatment would cause the inmate to suffer a "permanent injury or life-long handicap," the condition is sufficiently serious to support a claim of an Eighth Amendment violation. *Id.*[3] In addition, a medical need is serious "if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Lanzaro*, 834 F.3d at 347 (quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d Cir. 1981).

To satisfy the second prong of the test, an inmate must show that prison officials knew of the inmate's need for medical care and intentionally refused to provide it. *Lanzaro*, 834 F.2d at 346 (3rd Cir. 1987) (citing *Ancata v. Prison Health Servs.*, 769 F.2d 700 (11th Cir. 1985)). A delay of medical treatment for a non-medical reason may form the foundation of a deliberate indifference claim. *Id.* Moreover, prison officials may not consciously opt for an "easier and

---

[3] Cases where courts have considered an inmate's medical need to be serious include the following: *Archer v. Dutcher*, 733 F.2d 14 (2d Cir. 1983) (pregnant inmate who miscarried presented cognizable claim where she alleged that defendants intentionally withheld emergency medical aid in order to make her suffer); *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980) (delay in providing oral surgery resulted in "continued and unnecessary pain and loss of teeth"), *cert. denied*, 450 U.S. 1051 (1981); *Laaman v. Helgemoe*, 437 F. Supp 269 (D.N.H. 1977) (denial of treatment may result in permanent damage or require corrective treatment); *Derrickson v. Keve*, 390 F. Supp. 905 (D. Del. 1975) (failure to perform elective surgery on inmate serving life sentence would result in permanent denial of medical treatment and would render inmate's condition irrevocable).

less efficacious" treatment of an inmate's condition. *Id*. (citing *West v. Keve*, 571 F.2d 158, 162 (3rd Cir. 1978)). On the other hand, courts have repeatedly held that medical malpractice and negligence do not constitute deliberate indifference. *Id*. Nor does mere disagreement with the doctor's course of treatment suffice. *Id*. Rather, the inmate must show that prison officials denied reasonable requests for medical treatment. *Id*.

As suggested, the second prong of the deliberate indifference test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate defendants." *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754 (3rd Cir. 1979). Courts have expressed an unwillingness to "second-guess the propriety or adequacy of a particular course of treatment," considering it a matter of "sound professional judgment." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Thus, courts have rarely found deliberate indifference in situations outside of those in which "prison authorities prevent an inmate from receiving recommended care," those in which prison authorities have denied "access to a physician capable of evaluating the need for such treatment," or those in which "systemic deficiencies in staffing . . . effectively deny inmates access to qualified medical personnel for diagnosis and treatment of serious health problems." *Pierce*, 612 F.2d at 762.

## V. Whether Reeves's Claims Can Survive Summary Judgment

In the context of deliberate indifference claims, courts have repeatedly ruled in favor of defendants where prison officials had seen and treated the inmate, regardless of whether that inmate was satisfied with his or her care. *See Estelle*, 429 U.S. 97 (1976) (inmate did not state a cause of action where he was seen by prison doctors on seventeen occasions spanning a three-month period); *Williams v. Kort*, 223 F. App'x 95 (3rd Cir. 2007) (affirming grant of summary judgment where prison doctor saw prisoner for medical complaints, but did not refer inmate to

11

specialist); *Brown v. Borough of Chambersburg*, 903 F.2d. 274 (3rd Cir. 1990) (affirming district court's conclusion that plaintiff's deliberate indifference claim was frivolous, where doctor visually examined plaintiff, even though the doctor did not discover plaintiff's two broken ribs); *Christy v. Robinson*, 216 F. Supp. 2d 398 (D.N.J. 2002) (Irenas, J.) (granting defendant's motion for summary judgment where plaintiff disagreed with the prison doctor's course of treatment).

*A. The Hudson Defendants: Hemsley and Aviles*

Both Hemsley and Aviles assert that they were never involved in Reeves's medical care and therefore cannot be held liable for violating his constitutional rights. Regardless, both are entitled to summary judgment on the merits.

In his May 16 Inmate Grievance Form, Reeves complains that he was receiving harmful medicine, and that nothing had been done about his eye problem. However, he had previously been seen by staff doctors on a handful of occasions, including the meeting with Dr. Zara on May 8, after which Dr. Zara prescribed "eye water" and referred Reeves to the eye clinic. By his own account, Reeves was displeased with his treatment, but did not dispute that he met with doctors several times. On two subsequent Inmate Grievance Forms, Reeves complains about the purported lack of treatment. However, in his deposition Reeves acknowledges meeting with several doctors and being prescribed eye drops.

Reeves also does not dispute that he met with an eye specialist, Dr. Lerner, while at Hudson. He recalls meeting Dr. Lerner on June 8, "somewhere in the gym." Although Dr. Lerner recommended that Reeves meet with an ophthalmologist to examine his visual acuity, he found no injury to the cornea or sclera, and did not recommend an emergency appointment. This assessment of Reeves's condition comports with Dr. Zara's opinion, stated in another

appointment with Reeves just one week prior to the June 8 meeting, that there was no need for immediate treatment.

These medical judgments cast doubt upon Reeves's unsubstantiated claim that his condition was "serious." The cumulative medical record, stretching back all the way to his initial stay at Jersey City Medical Center—and notwithstanding Reeves's unsupported assertions that he suffered third or fourth degree burns and that he was going blind—indicates nothing more than a minor injury. The record establishes that Reeves was not subject to "undue suffering or the threat of tangible residual injury," *Lanzaro*, 834 F.2d at 346, and that his injury was not sufficiently serious to satisfy the first prong of the deliberate indifference test.

In addition, the treatment Reeves received at Hudson cannot be characterized as deliberately indifferent. To constitute deliberate indifference, prison officials must know of the prisoner's need for care and refuse to provide it. *Id*. While Reeves does disparage the quality of the care he received at Hudson, he does not dispute that after he notified prison officials of his condition he was sent to several doctors. And while he does contend that he was given the incorrect medicine (a claim he does not attempt to substantiate), he admits that he was prescribed a course of treatment. Given courts' hesitancy to "second-guess the propriety or adequacy of a particular course of treatment," *Bowring*, 551 F.2d at 48, the attempts to treat Reeves at Hudson preclude his success on the merits. Further, this is not a case where a prisoner was denied "access to a physician capable of evaluating the need for such treatment." *Pierce*, 612 F.2d at 762. Even after resolving the few factual disputes in Reeves's favor, a reasonable jury could not find in his favor. *See Anderson*, 477 U.S. at 248. Therefore, Hemsley and Aviles's motions for summary judgment are granted.

*B. The Essex Defendants: Annicette, Hendricks, and CFG*

Like the Hudson defendants, Annicette and Hendricks assert that they did not personally treat Reeves. Also, as in the case of the Hudson defendants, no constitutional violation occurred.

When Reeves arrived at Essex on June 9, 2009, he met with an intake nurse. Reeves claims that he mentioned his eye condition to the nurse, but that she ignored him to flirt with a guard. The record from that meeting contains no mention of Reeves's eye condition. Nevertheless, about a week later Reeves met with a staff doctor, and a few days later he met with another doctor. Both concluded that Reeves had sties in his eyes, a relatively minor condition; indeed, they went away shortly thereafter. The doctors prescribed Reeves hot packs to soothe the discomfort, as well as Tylenol, eye wash, and an eye solution. Though in his opposition motion Reeves contends that he never received a hot compress, he does not claim that he never received the other medications. Soon after, Reeves was sent to another eye specialist at East Orange General Hospital. On August 10, the specialist found that Reeves had "dry eyes" and was both near- and farsighted, for which the doctor prescribed eye drops and prescription glasses. Reeves claims that the eye drops were not delivered for a month, and the eyeglasses never came. He was released from Essex on October 19.

Resolving all factual disputes in Reeves's favor, it remains the case that no "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. First, Reeves's medical need was not serious. He merely had poor vision, dry eyes, and sties that went away shortly after he was seen by a doctor. Furthermore, even if it is true that the intake nurse ignored him, he never received his hot compresses, the specialist's eye drops took a month to arrive, and the eyeglasses never came, Essex did not intentionally refuse to provide him care. He did receive care, and received care again on many occasions. As was the case at Hudson, he was not

pleased with the care he received.  However, displeasure and disagreement with a doctor's course of treatment are not sufficient foundations for a deliberate indifference claim.  *Lanzaro*, 834 F.2d at 346.  Furthermore, Reeves does not allege that he was denied "access to a physician capable of evaluating the need for such treatment." *Pierce*, 612 F.2d at 762.  For these reasons, the motions for summary judgment by Annicette, Hendricks, and CFG are granted.

## VII. Conclusion

For the foregoing reasons, the defendants' motions for summary judgment [D.E. 93, 97, 99, 100], and the case is dismissed.  An appropriate order will be entered.

|  |  |
|---|---|
| June 30, 2011 | /s/ Katharine S. Hayden<br>Katharine S. Hayden, U.S.D.J. |